UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DENNIS FRANCIS KOWALSKE,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Case No. 21-cv-12627<br>Honorable Stephen J. Murphy, III<br>Magistrate Judge Elizabeth A. Stafford |

**REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR
SUMMARY JUDGMENT (ECF NOS. 9, 11)**

I.     **Introduction**

Plaintiff Dennis Francis Kowalske appeals a final decision of

defendant Commissioner of Social Security (Commissioner) denying his

application for disability insurance benefits (DIB) under the Social Security

Act.  Both parties have filed summary judgment motions, referred to this

Court for a report and recommendation under 28 U.S.C. § 636(b)(1)(B).

After review of the record, the Court **RECOMMENDS** that:

- Kowalske's motion (ECF No. 9) be **DENIED**;

- the Commissioner's motion (ECF No. 11) be **GRANTED**; and

- the ALJ's decision be **AFFIRMED** under sentence four of 42 U.S.C.
  § 405(g).

## II.    Background

### A.  Kowalske's Background and Disability Application

Born in December 1953, Kowalske was 62 years old at the time of his alleged onset date.  ECF No. 7, PageID.88.  Kowalske had past relevant work as a safety instructor.  *Id.* at PageID.52.  He claimed to be disabled from type 2 diabetes, pinched nerves in the cervical spine, and arthritis in the knees.  *Id.* at PageID.88.

After the Commissioner denied his disability application initially, Kowalske requested a hearing, which took place in October 2020.  *Id.* at PageID.45.  Kowalske and a vocational expert (VE) testified at the hearing. *Id.*  In the decision that followed, the ALJ found Kowalske not disabled.  *Id.* at PageID.53.  The Appeals Council denied review, and the ALJ's decision became the final decision of the Commissioner.  *Id.* at PageID.29. Kowalske timely filed for judicial review.  ECF No. 1.

### B. The ALJ's Application of the Disability Framework Analysis

A "disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

2

can be expected to last for a continuous period of not less than 12 months."

42 U.S.C. § 423(d)(1)(A).

The Commissioner determines whether an applicant is disabled by analyzing five sequential steps.  First, if the applicant is "doing substantial gainful activity," he or she will be found not disabled.  20 C.F.R. § 404.1520(a)(4).  Second, if the claimant has not had a severe impairment or a combination of such impairments[1] for a continuous period of at least 12 months, no disability will be found.  *Id.*  Third, if the claimant's severe impairments meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, the claimant will be found disabled. *Id.*  If the fourth step is reached, the Commissioner considers its assessment of the claimant's residual functional capacity (RFC), and will find the claimant not disabled if he or she can still do past relevant work. *Id.*  At the final step, the Commissioner reviews the claimant's RFC, age, education, and work experiences, and determines whether the claimant could adjust to other work.  *Id.*  The claimant bears the burden of proof throughout the first four steps, but the burden shifts to the Commissioner if

---

[1] A severe impairment is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).

the fifth step is reached.  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Applying this framework, the ALJ concluded that Kowalske was not disabled.  At the first step, she found that Kowalske had not engaged in substantial gainful activity since the alleged onset date.  ECF No. 7, PageID.47.  At the second step, the ALJ found that Kowalske had the severe impairments of diabetes mellitus, obesity, osteoarthritis of the knee, cervical disc disorder, essential hypertension, and hyperlipidemia.  *Id.* at PageID.48.  Next, the ALJ concluded that none of his impairments, either alone or in combination, met or medically equaled the severity of a listed impairment.  *Id.*

Between the third and fourth steps, the ALJ found that Kowalske had the RFC to perform light work,[2] except

> the claimant can occasionally climb ramps and stairs, but never ladders, ropes and scaffolds.  The claimant can occasionally balance, stoop, kneel, crouch and crawl.  The claimant is limited to occasional exposure to vibration and no exposure to unprotected heights and dangerous machinery.  The claimant requires a sit/stand option permitting change in position every 30 minutes if needed and without disturbing the workplace for a short period of time, less than 5 minutes.

---

[2] Light work involves occasionally lifting or carrying 20 pounds at a time, frequently lifting or carrying ten pounds at a time, and standing or walking for six hours out of an eight-hour workday.  20 C.F.R. § 404.1567(b); Social Security Regulation (SSR) 83-10.

*Id.* at PageID.49.  At step four, the ALJ found that Kowalske could perform his past relevant work as a safety instructor.  *Id.* at PageID.73.  She did not reach step five of the analysis.  The ALJ thus concluded that Kowalske was not disabled.  *Id.* at PageID.53.

### III.   Analysis

### A.

Under § 405(g), this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made in conformity with proper legal standards.  *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014).

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

Kowalske argues that the ALJ failed to properly weigh the medical opinions of the state agency medical examiners and the consultative examiner.  The Court disagrees and recommends the ALJ's decision be affirmed.

5

**B.**

Kowlaske argues that in determining the RFC, the ALJ failed to properly weigh the medical opinions of state agency medical examiners Helene Jones, M.D., and Susan Courtnage, M.D., and consultative examiner Jai Prasad, M.D.  ECF No. 9, PageID.893-904.  Kowalske contends that the ALJ failed to explain why she found these opinions persuasive.  *Id.*  And he asserts that, even if the ALJ did explain her analysis of the evidence, her rationale is flawed.  *Id.* at PageID.894.

ALJs must assess the persuasiveness of all opinions from both treating and non-treating sources by considering several factors, the most important being the opinion's supportability and consistency with the record evidence.  20 C.F.R. § 404.1520c(b)(2).[3]  Under the supportability factor, the more relevant "objective medical evidence and supporting explanations presented by a medical source to support his or her medical opinion," the more persuasive the medical opinion will be.  § 404.1520c(c)(1).  An opinion that is more consistent with the evidence from other medical

---

[3] The treating physician rule, which required ALJs to give controlling weight to well-supported opinions of treating sources, does not apply here because Kowalske applied for disability after March 27, 2017.  *See Wolfe v. Comm'r of Soc. Sec*., 16-13620, 2017 WL 6627044, at *7 n.4 (E.D. Mich. Nov. 26, 2017), *adopted*, 2017 WL 6621538 (E.D. Mich. Dec. 28, 2017).

sources and nonmedical sources is also more persuasive.

§ 404.1520c(c)(2).

In addressing Kowalske's arguments, the Court is mindful that it lacks the authority to independently weigh the evidence. *Hatmaker v. Comm'r of Soc. Sec.*, 965 F. Supp. 2d 917, 930 (E.D. Tenn. 2013) ("The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion."); *see also Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) ("If the Secretary's decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently, and even if substantial evidence also supports the opposite conclusion.").  Kowalske's arguments conflict with this Court's limited role, and none suggests that the ALJ abused her wide discretion.

In November 2019, Dr. Prasad examined Kowalske and noted his findings, but Dr. Prasad provided no RFC assessment.  ECF No. 7, PageID.731-738.  Based on her review of the record two weeks later, Dr. Jones opined that Kowalske could perform light work but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; never climb ladders, ropes, and scaffolds; and should avoid concentrated

exposure to vibration and hazards like machinery and heights.  *Id.* at PageID.95-97.  In April 2020, Dr. Courtnage adopted Dr. Jones's RFC, except that she found that Kowalske could frequently balance and did not need to avoid vibration.  *Id.* at PageID.111-112.

The ALJ found Dr. Jones's and Dr. Courtnage's opinions persuasive, explaining that "they are consistent with the claimant's medical records, objective findings, and treatment history."  *Id.* at PageID.52.  She also found Dr. Prasad's report persuasive "as to the examination findings" but noted that he "did not provide an actual opinion as to the claimant's functional limitations."  *Id.*  The ALJ adopted Dr. Jones's RFC but added that Kowalske required a sit/stand option permitting a change of position every 30 minutes.  *Id.* at PageID.49.  The ALJ's rationale in this part of the decision was brief, but she provided more analysis in her earlier discussion.

The ALJ summarized Kowalske's medical history and found that his statements about his limitations were inconsistent with the evidence.  *Id.* at PageID.50-51.  She reasoned that the record showed no "significantly limited range of motion, motor weakness, neurological deficits, or sensation loss that are associated with disabling pain."  *Id.* at PageID.51.  January 2020 imaging showed severe degenerative changes in Kowalske's knees, but the ALJ noted that Dr. Prasad observed normal gait and full range of

8

motion and found no need for an assistive device to walk.  *Id.*  As for the

degenerative changes in Kowalske's cervical spine, the ALJ found that his

treatment was sparse and conservative, with minimal objective findings of

pain or impairment.  *Id.*  And while Kowalske's diabetes was uncontrolled,

the record showed this was the product of noncompliance with diet,

exercise, and monitoring blood sugar.  *Id.*

The Court finds no error in the ALJ's analysis of the opinion evidence.

The next question is whether the ALJ's assessment of Kowalske's

knee and spine conditions and diabetes is supported by substantial

evidence.

### 1.

The Court begins by evaluating Kowalske's treatment for his knee

condition.  At a March 2016 visit with neurosurgeon Tejpaul Pannu, M.D.,

Kowalske's lower extremity joints were unremarkable.  *Id.* at PageID.506.

Kowlaske first complained of knee pain in June 2017, and his primary care

physician Henry Jurasek, M.D., prescribed an NSAID and gave him a

steroid injection.  *Id.* at PageID.460.  A knee x-ray showed mild

osteoarthritis in the right knee and moderate osteoarthritis in the left knee.

*Id.* at PageID.472.  Kowalske's endocrinologist, Sleman Khoury, M.D.,

noted in July 2017 that the steroid injection likely exacerbated Kowalske's

diabetes by increasing his A1C.  *Id.* at PageID.532.  Kowalske did not

complain about his knees again until August 2019, when he told Dr. Khoury

that he could not exercise because of knee problems.  *Id.* at PageID.680.

During the consultative examination in November 2019, Kowalske

complained of pain and stiffness in both knees that improved with steroid

injections.  *Id.* at PageID.731.  Dr. Prasad observed that Kowalske had a

normal gait and some tenderness in the knees without swelling or effusion.

*Id.* at PageID.733.  Kowalske had normal range of motion in his knees and

had no medical need for a cane, but he could not squat and climbed stairs

slowly.  *Id.* at PageID.735-737.  Dr. Prasad diagnosed early arthritis of the

knees.  *Id.* at PageID.734.

In January 2020, Dr. Jurasek gave Kowalske another injection for

knee pain.  *Id.* at PageID.739.  The next day, orthopedist Eric Silberg, M.D.,

stated that x-rays showed severe medial joint space narrowing with

significant degeneration of the patella femoral joint in both knees, with a

"bone on bone presentation."  *Id.* at PageID.767 (cleaned up).  Dr. Silberg

explained that Kowalske had "moderate arthritic changes of the

pattelofemoral joints" and suggested treatment options including weight

loss, strengthening, physical therapy, injections, and possible surgery in the

future.  *Id.*  He also gave Kowalske injections in both knees.  *Id.*  In

10

February 2020, Kowalske obtained a handicapped parking placard. *Id.* at
PageID.771.

Kowalske contends that this evidence shows a significant worsening
of his knees between 2017 and 2020. ECF No. 9, PageID.894. Thus, he
argues, the ALJ erred in adopting Dr. Jones's RFC, as the records from
January 2020 were unavailable when Dr. Jones rendered her opinion. *Id.*
But the relevant period for Kowalske's claim runs from his alleged onset
date of January 30, 2016, to his date last insured of September 30, 2019.
*See Watters v. Comm'r of Soc. Sec.*, 530 F. App'x 419, 421 (6th Cir. 2013).
Evidence of a claimant's medical condition after the date last insured is
only considered if it is relevant to the claimant's health before that date.
*Jones v. Comm'r of Soc. Sec.*, 121 F.3d 708 (Table) (6th Cir. 1997); *Higgs
v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988). Even if the January 2020
records are relevant to Kowalske's knee condition in September 2019, his
argument is unavailing.

An ALJ may rely on a state-agency physician's opinion that was
based on an incomplete record so long as the ALJ considers the later-
acquired evidence. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th
Cir. 2016) (cleaned up); *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 513
(6th Cir. 2010) (an ALJ did not err by relying on a state-agency physician's

RFC opinion that did not account for later-submitted evidence when the ALJ considered that evidence).  And so long as the ALJ considers the evidence "that lie[s] outside the portion of the case record that the non-examining source reviewed," she need not expressly discuss the fact that the source reviewed an incomplete record.  *Sloan v. Comm'r of Soc. Sec.*, No. 17-11150, 2019 WL 458163, at *3 (E.D. Mich. Feb. 6, 2019).[4]

The ALJ here considered the 2020 medical records.  She discussed the January 2020 x-rays showing significant degenerative changes and Dr. Silberg's diagnosis.  ECF No. 7, PageID.50-51.  But the ALJ found that they did not warrant a more restrictive RFC because Dr. Prasad observed just two months earlier that Kowalske had a normal gait, full range of motion in his knees, and did not need a cane to walk.  *Id.*  What is more, Dr. Courtnage reviewed the complete medical record—including the 2020 records—and adopted Dr. Jones's RFC.  *Id.* at PageID.107-112.  And despite the "severe" and "significant" degenerative changes shown in the x-rays, Dr. Silberg opined that Kowalske had moderate arthritic changes and recommended conservative treatment including weight loss, physical

---

[4] Kowalske's unsupported suggestion that the 2017 amendment to 20 C.F.R. § 404.1520c changed this analysis lacks merit, as courts still apply *Miller*.  *See, e.g.*, *Dockey v. Comm'r of Soc. Sec.*, No. 1:20-cv-153, 2021 WL 1206645, at *6 (W.D. Mich. Mar. 31, 2021).

therapy, and injections.  *Id.* at PageID.767.  He described surgery only as a future possibility.  *Id.*  Even if the January 2020 x-rays could have supported a conclusion that Kowalske had greater limitations during the relevant period, the Court "may not reweigh the evidence and substitute its own judgment."  *See Hatmaker*, 965 F. Supp. 2d at 930; *see also Cutlip*, 25 F.3d at 286.

Kowalske challenges the ALJ's reliance on Dr. Courtnage's opinion, arguing that she did not explain why the 2020 records did not support changing the RFC.  ECF No. 9, PageID.896 (quoting ECF No. 7, PageID.112).  But Kowalske cites no authority—nor is the Court aware of any—requiring state-agency physicians to supply comprehensive explanations for their opinions.  State-agency physicians "are highly qualified medical sources who are also experts in the evaluation of medical issues in disability claims under the Act."  SSR 17-2p.  ALJs are thus entitled to accord great weight to state-agency physicians if their opinions are supported by the record.  *Hoskins v. Comm'r of Soc. Sec.*, 106 F. App'x 412, 415 (6th Cir. 2004).  For the reasons explained above, the ALJ reasonably concluded that Dr. Courtnage's opinion was consistent with the record.

Next, Kowalske contends that the ALJ failed to discuss the supportability or consistency of Dr. Prasad's opinion that Kowalske did not need a cane.  ECF No. 9, PageID.902.  The ALJ found Dr. Prasad's report persuasive but did not expressly address supportability or consistency, as he "did not provide an actual opinion as to the claimant's functional limitations."  ECF No. 7, PageID.52.  Even if Dr. Prasad's conclusion was an opinion requiring analysis under 20 C.F.R. § 404.1520c, remand is not appropriate because the record does not support Kowalske's need for a cane.

"To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need" for the device and describing the circumstances when it is needed (e.g., "whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information").  SSR 96-9p; *see also Schwartz v. Comm'r of Soc. Sec.*, No. 4:18-cv-12190, 2019 WL 3943863, at \*5-6 (E.D. Mich. Aug. 1, 2019).  No documentation establishing the need for a hand-held device exists here.  Kowalske contends that the handicapped parking placard shows his need for a cane.  But while the ALJ noted that Dr. Jurasek recommended the placard, there is no supporting medical documentation in the record.  *See* ECF No. 7, PageID.50.  Thus, Kowalske has not shown

14

his need for a cane as required under SSR 96-9p.  In the absence of such evidence, remand is inappropriate.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 507 (6th Cir. 2006) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."); *Turrentine v. Kijakazi*, No. 4:20-CV-00567, 2021 WL 3421404, at *6 (N.D. Ala. Aug. 5, 2021) (declining to remand for an ALJ's failure to address supportability of a medical opinion when the record contained no evidence that the claimant was prescribed a cane).

The Court finds that the ALJ's analysis of Kowalske's knee condition was supported by substantial evidence.

**2.**

Next, the Court evaluates the medical records relevant to Kowalske's spinal condition.  In December 2015, Kowalske complained of unbearable pain in his cervical and thoracic spine and was diagnosed with a pinched nerve.  ECF No. 7, PageID.468-470.  Nurse practitioner Nora Creighton observed cervical and thoracic tenderness and paraspinal muscle spasms. *Id.*  In early 2016, Kowalske reported that while his left shoulder and arm remained painful and that his fingers were sometimes numb, the pain was

lessening.  *Id.* at PageID.302, 466.  Creighton diagnosed him with cervical radiculopathy and radicular pain of the thoracic region.  *Id.* at PageID.466.

Kowalske had cervical and thoracic spine MRIs in February 2016. The cervical MRI showed a large focal disc extrusion at the left neural foramen at C6 and C7 causing severe left neural foraminal narrowing, but there was no evidence of spinal canal stenosis.  *Id.* at PageID.479-478. The thoracic MRI showed ventral displacement and flattening of the spinal cord at T2 through T4 and a lack of cerebrospinal fluid along the spinal cord.  *Id.* at PageID.477-478.  But there was no significant disc protrusion, spinal canal stenosis, or foraminal narrowing.  *Id.*

Kowalske saw Dr. Pannu for a neurosurgery consult in March 2016. Kowalske reported that his pain had gradually improved on its own.  *Id.* at PageID.506.  He reported weakness in his triceps and numbness and tingling in his fingers but denied any significant neck or arm pain.  *Id.*  He experienced no flare ups when he resumed activities two weeks prior.  *Id.* Dr. Pannu observed that Kowalske's cervical spine had normal range of motion but was tender to palpation.  *Id.* at PageID.507.  The lumbar spine also had normal range of motion.  *Id.*  Dr. Pannu diagnosed cervical radiculopathy at C7, noting that the MRI showed a large herniated disc at C6-C7 and a small herniated disc at C5-C6, consistent with Kowalske's

16

symptoms.  *Id.*  He found there was no evidence of spinal cord injury and that Kowalske was tolerating the herniation well.  *Id.*  He recommended resuming activities; if the symptoms returned, Kowalske could contact Dr. Pannu about treatment options such as physical therapy, steroid injections, or surgery.  *Id.*

Kowalske did not seek further treatment.  In March 2017, Dr. Jurasek noted during a routine physical that Kowalske had full range of motion in his neck, his sensory examination was normal, and he had normal reflexes and motor strength in his upper and lower extremities.  *Id.* at PageID.462-63.  The next reference to Kowalske's spinal condition is in Dr. Prasad's November 2019 report.  Kowalske complained of numbness and pain in both feet, pain and stiffness in his neck, numbness in his fingers, and some weakness in the left arm.  *Id.* at PageID.731-732.  Dr. Prasad noted that an MRI showed extensive degenerative disc disease in the cervical spine.  *Id.* at PageID.732.  On examination, Dr. Prasad observed sensory loss in Kowalske's left fingers but found that he could button clothes, tie shoelaces, and pick up a coin.  *Id.* at PageID.733.  Examination of the cervical spine showed tenderness at C5-C6 and muscle rigidity and spasm at the back of spine.  *Id.*  Kowalske had diminished range of motion in the cervical and lumbar spine, but Kowalske could perform all postural

maneuvers except for squatting and could perform all manipulative maneuvers.  *Id.* at PageID.735-737.  Dr. Prasad diagnosed peripheral neuropathy in both feet, cervical spine degenerative disc disease with disc protrusion at C5-C6, and radiculopathy at the C7 root in the left arm.  *Id.* at PageID.733-734.

A January 2020 x-ray of the cervical spine showed scattered anterior osteophytes and disc space narrowing at C4 through C7.  *Id.* at PageID.741.  The radiologist concluded that Kowalske had mid and lower cervical spine degenerative disease with no acuity.  *Id.*

This evidence supports the ALJ's reasoning that the records for Kowalske's spinal condition are sparse, with recommendations for conservative treatment and minimal objective findings.  While Kowalske experienced significant pain in December 2015, the pain subsided within three months, and he sought no more treatment.  And while the MRIs showed "extensive degenerative disc disease," Dr. Pannu's and Dr. Prasad's findings were relatively benign.  *Id.* at PageID.732.  Dr. Pannu observed normal range of motion in the cervical and lumbar spine and only tenderness on palpation.  *Id.* at PageID.507.  Dr. Prasad observed tenderness, spasms, and diminished range of motion in the cervical spine.  *Id.* at PageID.733.  Even so, Dr. Prasad noted that Kowalske could perform

all postural maneuvers except squat and did not need a cane.  *Id.* at

PageID.735-737.

Kowalske contends that the ALJ failed to consider whether the

medical record was "sparse" because he could not afford treatment, citing

medical records referencing his inability to afford some medications.  ECF

No. 9, PageID.900-901 (citing ECF No. 7, PageID.314, 522, 680).  It is true

that an ALJ "may not draw any inferences about an individual's symptoms

without first considering any explanations or other information in the case

record, that may explain failure to seek medical treatment."  *Kallas v.*

*Comm'r of Soc. Sec.*, No. 2:20-cv-11401, 2021 WL 4930343, at *14 (E.D.

Mich. Sept. 29, 2021), *adopted*, 2021 WL 4920731 (E.D. Mich. Oct. 21,

2021) (cleaned up).  But the record shows that Kowalske could not afford

Glyxambi and Repatha (a PSK9 inhibitor) when his insurer declined to

cover them.  ECF No. 7, PageID.314, 321, 491, 525, 530, 532.  There is no

indication that his insurer would have declined to cover treatment for his

spinal condition.  And as the Commissioner argues, Kowalske's argument

is undermined by his significant improvement shortly after his spinal

condition was diagnosed.  Even when Kowalske mentioned knee and leg

pain to his endocrinologist and primary care doctor, he made no complaints

about spinal pain.  *See id.* at PageID.460, 532, 680, 739.  And given his

19

frequent endocrinology visits, the record shows that Kowalske could afford medical treatment when necessary.  *See Van Heck v. Comm'r of Soc. Sec.*, No. 06-15233, 2008 WL 1808320, at *6 (E.D. Mich. Apr. 21, 2008).

Kowalske also takes issue with the ALJ's statement that the record showed no "significantly limited range of motion, motor weakness, neurological deficits, or sensation loss that are associated with intense and disabling pain."  ECF No. 9, PageID.898-899 (quoting ECF No. 7, PageID.51).  He correctly notes that the record shows he had diminished range of motion in his spine and sensory loss in his hand due to radiculopathy.  *Id.*  The ALJ acknowledged these limitations but found they were not significant enough to render Kowalske disabled since his limited treatment was conservative and the clinical findings were minimal.  ECF No. 7, PageID.50-51.  As discussed above, the ALJ's conclusions were supported by the record.

### 3.

Last, the Court evaluates the evidence about Kowalske's diabetes.  In July and October 2015, Kowalske was "doing well from a diabetes perspective" on a combination of Glyxambi and metformin, with blood sugars in the low 100s and A1C values of 6.5 and 6.6%.  *Id.* at

PageID.294-300.  Dr. Khoury commended him on his compliance with treatment.  *Id.* at PageID.300.

In January 2016, Kowalske's A1C rose to 7.4%, his blood sugar rose to 147, and he admitted that he had been binge eating.  *Id.* at PaageID.302.  Dr. Khoury stressed the need for dietary compliance and encouraged Kowalske to exercise and lose weight.  *Id.* at PageID.306. Kowalske's A1C levels and blood sugar remained elevated through October 2016, and Kowalske admitted that he did not check his blood sugar regularly, did not exercise, and did not monitor his carbohydrate intake.  *Id.* at PageID.308-317.  At his October 2016 visit, Dr. Khoury told Kowalske that the next step would be insulin.  *Id.* at PageID.317.

When the A1C values did not improve by January and April 2017, Dr. Khoury noted that Kowalske's diabetes was uncontrolled, he did not diet or exercise, and he would have to start insulin if his A1C was not below 7.0% in three months.  *Id.* at PageID.319-321, 534-536.  Over the next year, Kowalske's A1C and blood sugar values remained elevated, and he was largely noncompliant with advice to diet, exercise, and check his blood sugar.  *Id.* at PageID.492-494, 530-533, 607-608.

In August 2018, Kowalske's A1C was 8.0%, and his blood sugar was 131.  *Id.* at PageID.490.  Nadia Khoury, M.D.,[5] noted that Kowalske had not been checking his blood sugar and did not adhere to his diet.  *Id.* at PageID.489.  She recommended continuing Kowalske's oral medications but also prescribed Tresiba, an insulin.  *Id.* at PageID.491.  In November 2018, Kowalske reported that he did not start the insulin as directed and instead lost 15 pounds and began monitoring his blood sugar three to four times a day.  *Id.* at PageID.523.  He reported his blood sugar was excellent, running in the low 100s.  *Id.*  His A1C dropped significantly to 6.2%.  *Id.*  Dr. Khoury commended Kowalske's compliance and advised him to continue taking his oral medications.  *Id.* at PageID.525.

By February 2019, Kowalske regained the weight he lost and discontinued Glyxambi because he could not afford the co-pay.  *Id.* at PageID.522.  His A1C increased to 7.4%, and his blood sugar was 184.  *Id.*  Dr. Khoury recommended diet and exercise.  *Id.* at PageID.523.  By May 2019, Kowalske gained another 15 pounds and was noncompliant with diet, exercise, and checking his blood sugars.  *Id.* at PageID.481.  His A1C was 8.9%, and his blood sugar was 169.  *Id.* at PageID.492.  He was unwilling

---

[5] Dr. Nadia Khoury is Dr. Sleman Khoury's medical partner.  *See* ECF No. 7, PageID.489.

to try new medications, and Dr. Nadia Khoury recommended that he re-commit to diet and exercise. *Id.* at PageID.493. In August 2019, Kowalske's A1C climbed to 9.1%, with blood sugar at 193. *Id.* at PageID.680. Kowalske was frustrated with his inability to afford Glyxambi or exercise due to his knee problems. *Id.* Dr. Khoury prescribed Jardiance, Januvia, and Soliqua (a combination of insulin and a GLP-receptor agonist). *Id.*

Dr. Nadia Khoury noted in November 2019 that Kowalske resumed Glyxambi and lost eight pounds. *Id.* at PageID.712-714. His A1C dropped to 6.8%, and his blood sugar was 163. *Id.* Later that month, Dr. Prasad found that Kowalske's diabetes was controlled with medication. *Id.* at PageID.731-733. Records from 2020 show that Kowalske's diabetes control was worse, with A1C values at 8.0%. *Id.* at PageID.790, 797-802. Although he continued Glyxambi, he had gained weight and reported dietary noncompliance. *Id.* A July 2020 eye exam showed that Kowalske had cataracts and suspected glaucoma but that he did not have diabetic neuropathy. *Id.* at PageID.842.

This evidence supports the ALJ's assessment that Kowalske's diabetes was exacerbated by his noncompliance with diet, exercise, and checking his blood sugar. *Id.* at PageID.51. It also supports her conclusion

23

that his diabetes did not cause end organ damage.  *Id.*  Kowalske's A1C and blood sugar significantly improved in late 2018 and late 2019 when he followed a diet and monitored his blood sugar.  *See id.* at PageID.523, 712-714.  And the record shows normal kidney and liver function, and that his diabetes did not impact his vision.  *See, e.g.*, *id.* at PageID.491, 494, 608, 795, 842.  While Kowalske's sporadic inability to afford Glyxambi may have contributed to his elevated A1C and blood sugar values, the record shows that his noncompliance with diet and exercise significantly impacted his diabetes control even when he took Glyxambi.  For example, Kowalske's diabetes control was poor in 2016 and 2017 because of his noncompliance although he was taking Glyxambi.  *Id.* at PageID.302-321, 534-536.  The same is true for 2020.  *Id.* at PageID.790, 797-802.

Thus, substantial evidence supports the ALJ's evaluation of Kowalske's diabetes.

## IV.   Conclusion

The Court **RECOMMENDS** that Kowalske's motion for summary judgment (ECF No. 9) be **DENIED**, the Commissioner's motion for summary judgment (ECF No. 11) be **GRANTED**, and the ALJ's decision be **AFFIRMED** under sentence four of 42 U.S.C. § 405(g).

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: October 19, 2022

## NOTICE TO THE PARTIES ABOUT OBJECTIONS

Within 14 days of being served with this report and recommendation, any party may serve and file specific written objections to this Court's findings and recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  If a party fails to timely file specific objections, any further appeal is waived.  *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*.*  And only the specific objections to this report and recommendation are preserved for appeal; all other objections are waived.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this report and recommendation to which it pertains.  Within 14 days after service of objections, **any non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in**

25

**length and complexity to the objections**, but there is otherwise no page limitation.  If the Court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First-Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 19, 2022.

s/Marlena Williams____
MARLENA WILLIAMS
Case Manager
